## 20444. BROOKS v. THE STATE.

CANDLER, Justice. Frank Lamar Brooks was indicted in Morgan County for the murder of Retha Nell Brooks, his wife. He was convicted, and on the jury's recommendation was sentenced to life imprisonment. In due time he moved for a new trial, basing his motion on the usual general grounds only, and the exception is to a judgment denying him a new trial. *Held:*

Since the verdict is amply supported by competent evidence, the judgment complained of is not erroneous.

*Judgment affirmed. All the Justices concur.*

ARGUED APRIL 14, 1959—
DECIDED MAY 8, 1959—REHEARING DENIED JUNE 5, 1959.

*William T. Brooks,* for plaintiff in error.

*George D. Lawrence, Solicitor-General, Eugene Cook, Attorney-General, Rubye G. Jackson, Deputy Assistant Attorney-General,* contra.

On the trial, the State's evidence and the defendant's statement, so far as need be related, were in substance as follows:

Mrs. Otis Ruark testified: She and her husband, Otis Ruark, were the defendant's nearest neighbors, residing from four to five hundred feet away from his home. About 9:30 p.m. on July 30, 1958, she heard two pistol shots at the home of the defendant, and at the same time she heard his wife, Retha Nell Brooks, scream. The two shots and the scream were simultaneous. She immediately went out on the porch of her house, after waking her husband, but saw no lights at the defendant's home. Her husband later came to the porch and told her that

she had not heard any shots, but had just been dreaming. He tried to get her to go back into the house and go back to bed. She went out to their car which was parked in the yard and begged her husband to take her to the defendant's home, insisting that she had heard two shots there and a scream by Mrs. Brooks. She then returned to the porch where her husband was standing and both then heard another pistol shot at the defendant's home. Right after that shot she heard the defendant say "Oh Nell." Immediately thereafter the defendant's truck was cranked up and he drove it by their home, but did not stop. He went to the home of Cortez Kimsey and to his father's home, which homes were near her home and then came back. He stopped at their home when her husband signaled him with a flashlight. Her husband asked him what had happened and he said "Nell fell over the fence and shot herself." She and her husband then went with the defendant to his home where she saw his wife lying face-down in the yard near a fence between the house the defendant lived in and a house he had built but had never occupied. She then asked the defendant where the pistol was and he replied, "It's around here somewhere." With the aid of a flashlight she then found the pistol lying in the grass on the opposite side of the fence from the place where Mrs. Brooks was lying.

Otis Ruark testified: He only heard one pistol shot at the defendant's home on the night of July 30, 1958. His wife woke him and said that she had heard two pistol shots at the defendant's home and had heard Mrs. Brooks scream. After his wife went out on the porch he got up, dressed, and followed her. When he got to the porch, his wife begged him for some time to take her to the defendant's home, but he declined to do so and told her she had just been dreaming. He then heard a pistol shot at the defendant's home and right after that heard the defendant say, "Oh Nell." Just a few seconds after he heard the shot, he started in his house to get his flashlight and by that time the defendant had started his truck and was coming toward his home. He signaled him to stop but he went on by. He returned in a few moments and stopped when he threw his flashlight on him. He then said: "Nell fell over the fence and she

shot herself." He and his wife went home with the defendant and he saw the defendant's wife lying in the grass face-down a few feet from a three-strand barbed wire fence. His wife found the defendant's pistol in the pasture on the opposite side of the fence from where the body of the defendant's wife was lying. It had three empty shells in it and six loaded ones.

L. W. Nelms testified: The deceased was his daughter. He talked to the defendant during the night of her death, and the defendant told him that his wife was out in the yard; that he heard one shot and heard his wife call him; that he ran out of the house, and she was tangled in the fence; and that he got down and took her under the fence and tried to put her in his truck but could not do so. He testified that the defendant during the same conversation told him about a love affair the deceased was having with a named man, and how two other men had recently made assaults on her. He went to the defendant's home the night his daughter was killed and saw two different places where she had bled and that he later saw a third place. From one of such places to another she had evidently been dragged as there was blood on the grass and weeds.

Francis Burge, a county policeman for Morgan County, testified: He inspected the defendant's premises on the morning after his wife was killed. He saw three different pools of blood and they were about twelve feet apart. The blood spots were all about the same size. The defendant told him that he heard two pistol shots while his wife was out in the yard.

Cortez Kimsey testified: The defendant came to his home the night his wife was killed and told him that "she got shot crossing the fence." He immediately went to the defendant's home. His wife was lying in the grass from six to eight feet from the wire fence between the house the defendant lived in and a new one he had built. The defendant's pistol was found on the opposite side of the same fence and from eight to twelve feet away from it, and there was a blood spot between the fence and the pistol. When he reached the defendant's home, his wife was lying in the yard, but she was still breathing. The defendant lives in Morgan County.

Dr. Larry B. Howard, Assistant Director of Georgia's Crime

Laboratory, testified: He performed an autopsy on the body of Mrs. Retha Nell Brooks. She had been shot three times with a pistol. One bullet entered her left temple, one entered her right temple, and one entered near her shoulder and ranged downward just under the skin to her abdominal cavity. The temple wounds were both fatal ones, and each would have produced unconsciousness immediately. Two of the wounds, the one in the left temple and the one near the left shoulder, were inflicted by bullets which came in the same direction from above and back to the left of her. As to these wounds, there were no powder burns. The wound in the right temple was inflicted while the pistol was within an inch of her head as shown by the powder burn pattern which the pistol made during firing tests. She was killed with a single-action pistol and it would have been physically impossible for her to have pulled its trigger after either one of the temple wounds was received, as the bullets inflicting them went completely through her brain. The witness was asked if he had examined the pistol which was found in the defendant's yard on the night of the killing and had made any tests with it. At this time counsel for the defendant stated in open court that the defendant admitted that the pistol in court was his and that the deceased was killed with it. This witness also testified that the body of the deceased must have been in a horizontal position when she received the wound that entered near her left shoulder and traveled down to her abdominal cavity just under the skin and that the body of a person crawling through a wire fence would be in a proper position to receive a wound of such location. He also testified that he found several fresh scratches on both sides of her throat and some fresh bruises on her body and testified positively that she could not have accidently shot herself and inflicted the wounds she received.

The State's evidence also shows that the defendant and the deceased had been married about eleven years and that they and their two small children lived alone.

The defendant in his statement to the jury denied the killing. He said that his wife left the house on the night she was killed, stating that she was going to their new home about 150 feet away to take a shower. Before leaving the house, she went into

another room, and he thought she was either getting some clothes or seeing about the children. A few minutes after she left the house, he thought he heard a shot and about that time his wife screamed "Lamar." He went out in the yard immediately, and found her rolling on the ground. He picked her up, carried her a few feet up to the fence, pulled her under the fence and toward his truck. He then realized that she would not be able to sit up in the truck, and he laid her down and left in his truck for help, returning immediately after notifying his father and some of the neighbors of the incident. He said that he bought the pistol for his wife; that he gave it to her; and that he had never seen it again until after she had been shot.